13-5051. Do I understand, Mr. Kirk, that you want to reserve five minutes for rebuttal? That is correct, Your Honor. Okay. You may proceed. Thank you, Judge O'Malley, and may it please the Court. The Court below made three fundamental errors that require reversal in this case. First, the Court held that the contractual phrase, taxes, fees, or charges, really just means taxes, thus reading charges and fees right out of the contract. The trial court did acknowledge that the ordinary meaning of the word charges is costs or expenses, but the Court refused to interpret the term as it's ordinarily understood in common parlance. Mr. Kirk, I want to nail something down, if you can. I'm going to ask the government to do the same thing. Certainly, Your Honor. The government's brief at page 10 says the oil company's long-time dumping of acid sludge of one method of disposal continued until the outbreak of World War II. And it looks to me like they're talking about Pearl Harbor. But wasn't it really defense policy in the United States, one, to provide avgas to the Brits starting in 1939, and two, to deny it, especially to the Japanese? And wasn't the oil industry ramping up to provide that gas as a matter of national defense in 39 pursuant to Roosevelt's direction? Your Honor, let me preface my answer by saying I don't know that there's anything specific in the record on this. Well, that's why I'm asking. But that being said, my understanding is that the ramp-up really began during calendar year 1941, before Pearl Harbor. And I think for the reasons Your Honor states, that the policy of the United States was to assist Great Britain at that time. So some of the governmental apparatus that led to these contracts was coming into place during the period before Pearl Harbor. Now, these contracts and this waste, it's, I think, agreed, both didn't come into being until after Pearl Harbor. The first of the contracts, I think, is February of 42. Yeah. And the sentence from the government's brief about practices pre-war relates not to the McCall site, but I think a stipulation that affected just general practices at a time when production was minute compared to what it became. So I don't know if that helps Your Honor, but that would be my answer to your question. Mr. Kirk, when I look at the contract itself, and the contract, your client, Shell Oil Company, what I would just readily term a sophisticated business entity, I mean, it negotiated the contract. It entered into this contract. And you're arguing that under the taxes provision of that contract, that the word charges means basically an open-ended identification for in perpetuity. Your Honor, that's correct, although I think even under the government's interpretation, the taxes part is an open-ended reimbursement in perpetuity. Well, that could be, but that deals with taxes. When I look at the taxes provision, and I look at the rest of the contract, and I see there's provisions dealing with duration, storage, even price escalation, price payment on A-103 under price escalation in subsection B, even the price is negotiated at one thousandth of, excuse me, by 719 ten thousandths of one cent. That's .000719% of a cent. I mean, that's pretty specific negotiation. Why didn't you enter, why is there no provision here that says indemnification? There's one for arbitration. The answer to your question, Your Honor, is the parties didn't agree to a sweeping indemnification clause. Instead, what they agreed to in section 12, and this is, by the way, in addition to the prices established in the provision you were just reading from, any new or additional taxes, fees, or charges. And what they were agreeing to was if any new outlays associated with the production of Avgas are borne by the oil companies, the government would recompense them for that. And in terms of the question about how long-lasting the promise is and how open-ended the promise is, the answer to that, Your Honor, is that it was bounded by the requirement that the taxes, fees, or charges be incurred by reason of the production of Avgas. To the extent it's shocking or surprising that costs related to this contract are coming into play 50, 60, 70 years later, that's a function of surplus, which was a surprise to all. But in terms of... Well, then let me ask you this, because it's not shocking to me anyway, because it was known that Avgas produced this waste. There's a byproduct to the production of Avgas, and a lot of this byproduct is by its nature toxic, it's waste, unless you reuse it. But at the end of the production line, you're going to end up with the waste product. That's true, Your Honor. But what this clause was dealing with was the possibility that some government at some point later, new or additional, is the adjectives here, might impose a tax, might impose a fee, might impose a charge. And my simple submission to you is that the plain meaning of charges is cost or expense. If you look at all the dictionary definitions... But at that time, it's known that the production of Avgas is going to produce waste. And in the industry world, waste equates to some extent to cost, doesn't it? True, but it was not known at the time that the costs would be imposed for depositing this material at the McCall site. And 50 years went by before a law was passed imposing those costs. And what the parties did anticipate and did agree to was the possibility that a new law would impose charges by reason of the production of Avgas. And that's precisely what happened here. Well, new and additional has to mean something. So the question is, is it your view that new and additional is sort of unbounded by way of time or scope? Yes, it is, Your Honor. And in that regard, I would cite the Ford case, where the court, particularly there was a discussion of an old court of claims case called Houdel in the Ford case, where the court made clear that so long as the expense was related to carrying out your obligations under the contract, and so long as there wasn't a provision excluding it, it's perfectly reasonable not to have a temporal… But wasn't the language in that contract a little more helpful to Ford? Wasn't there a known or unknown indemnification clause?  And the court had to find that both covered it. The first didn't have the known or unknown. That was the main contract that the parties entered during the war. It just said any property damage on account of performance of the contract. So the government made the same argument there that it's making here. Where the known or unknown came in was at the end of the war there was a termination agreement, and the termination agreement included a complete general release, but then there was an exception for any known or unknown claims. So in that case, Ford had to both be within the original language of the contract, which didn't have the known or unknown, and had to be within the termination agreement, which did. And the court's analysis was, if it says that it's an expense that's borne, that the government is supposed to pay, and there's nothing in the contract limiting the time, it's perfectly reasonable and within the party's intentions for that to be put on the government. They agreed to undertake it. Judge Smith's first time around, Judge Smith's analysis effectively was that this was a contract of adhesion. That is, he said, well, they could have taken it, and it was informed in that light. Who drafted this thing? Do you know? Is that in the record? I think the amicus brief submitted by Exxon goes into that a little bit, and my understanding was that it was drafted by the government, and the form was established in some of the Exxon contracts. It sure looks that way. That being said, I think the government drafted it, and so to the extent that matters, I think that cuts in our favor. That being said, I don't think Judge Smith was quite going as far as to suggest it was a contract of adhesion, and I certainly don't need you to find that for me to win. I think I win on the plain language. Sure, but if we're looking at something that may be ambiguous, then it cuts against the draft. That would be correct, Your Honor, and I think it's clear that the government did draft these. Going back to the Ford case, isn't it the case of both in Ford and in DuPont, the contracts did have an open-ended identification clause? I mean, a specific clause that dealt with identification of expenses. The Ford clause referred to, as an allowable expense, any amounts paid on account of damage to property, and whether you call that an identification or not, it was a reimbursement provision for anything related to damage to property. The DuPont case was a more classic identification-type clause, you know, with whole harmless-type language. In this case, either type of language is missing, isn't it? No, but the language that is here is buyer shall pay. But why is it under the tax provision? Because the tax provision, I take it you're just referring to the title that appears at the start of the thing. Sure, the tax clause. But if you read the clause, it's a taxes, fees, or charges clause. I don't think you could come out any differently in this case based on whether the heading was taxes, fees, or charges versus taxes. The fact remains it wasn't just taxes, it was also fees or charges. And the only understanding of the meaning of charges that fits this context is cost or expense. If you look at all the dictionary definitions, all the other definitions obviously don't apply. There are things like jury charges and so forth. What's your response to the argument that those charges, the taxes and the fees and the charges, apply to the price modification sections of the contract? It's clear from the text of the contract that they're in addition to that. And, Your Honor, I'd refer you to the Shell contract in Appendix 136, which is the very beginning of the clause at issue. Buyers shall pay in addition to the prices established in Sections 4 and 5 hereof. Sections 4 and 5 are the price clauses. This is saying that this payment must be made in addition to the price per gallon. What about the last sentence in that paragraph? It says, buyers shall also pay such taxes, et cetera, to the extent such taxes, meaning the taxes referred to in the provision, result in increased cost of the commodities delivered there under not compensated by Section 4. It seems that that whole paragraph is related to the price adjustment and the price escalation provisions of the contract. Your Honor, I must disagree with that. The first sentence says, any taxes, fees, or charges, and then there's the exception for income, excess profits, or corporate franchise taxes, which any law requires the oil companies to collect or pay by reason of production, shall be paid by the buyer. Then the second sentence says, buyers shall also pay any such taxes. Now, we're not talking about fees and charges, just any taxes on crude or transportation, but there's an exception to the crude or transportation taxes for anything that has already been built into the price, because remember, the price was calculated based on an estimate of what the cost would be. So this is all consistent with the basic intent of the parties, which was, all of the costs associated with producing this ag gas, the government would bear, and in exchange, the oil companies would be limited to very modest profits that would be capped by statute that was designed to prevent profiteering. So all that the sentence you just pointed to is saying is, if we've already given you the costs of these additional taxes on crude or transportation, you don't get to double claim them in the first sentence. All right, before you have to sit down, and we'll give you some more time and make it up for the government as well, but I want to talk about the Anti-Deficiency Act. You do rely on the Biddle opinion, and you rely on Executive Order 9001, but neither the Biddle opinion nor your argument really address the clause that the government grabs onto, which is, are authorized within the limits of the amounts appropriated therefore. So how do you respond to that? Your Honor, let me start my response to that by emphasizing two points that I think are undisputed, and then I want to deal directly with that language. The two points that are undisputed, because they set the context for interpreting that language. Point number one, I think it's undisputed that the Anti-Deficiency Act itself does not apply if the contractual promise is authorized by law. That's in the language of the Anti-Deficiency Act. And point number two, it was not disputed by the court below or by the government that Congress in fact did authorize this in the first War Powers Act. So the only dispute here has been not whether it was authorized by law by Congress, but whether President Roosevelt exercised the authority Congress gave him by delegating it. And that's where we get to the 9001 argument. And there, if you look closely at what the government's position is, it's as follows. They concede that the language in 9001 that I rely on that says without regard to any contractual provisions exercises President Roosevelt's first War Powers power. But their argument is that he reimposed what they call the Anti-Deficiency Act in the language you cite. Right. And with that preamble, let me tell you why they don't win under that argument. Okay. And it boils down to this. If you take a look at the Anti-Deficiency Act, which is reprinted on page 39 of our brief, and you compare it to that language, you're going to see that the two things are very different. The language of the Anti-Deficiency Act imposes two different obligations. Obligation number one is don't make any expenditures in excess of appropriations during the fiscal year. Let me pause and let you get to it because this is important. I've got it. Okay. And that's really the first sentence of the statute. Then the second part of the statute says, and don't involve the government in any contract or obligation for the future payment of money in excess of such appropriations. It's our submission, Your Honor, that where President Roosevelt reimposed something, he only reimposed the first obligation. And it's the second one, talking about future obligations in future years that might not be covered by appropriations, that is what gives rise to the rule that ordinarily, under ordinary, non-World War II circumstances, you can't have a contract that provides an open-ended indemnification. If President Roosevelt had wanted to reimpose that obligation, he would have included the second part of the language about the future payment in excess of money appropriations. And if there's any doubt on this, Your Honor, I really do believe that that's where this court must defer to Attorney General Biddle. General Biddle was addressing, and I note my red light's on, so if I could finish the thought, General Biddle was addressing the very question that is before this court. Was an open-ended reimbursement promise like the one we have in this contract authorized? All right, but respond then to the government's argument that Biddle was really not responding to that, that while he might have said something that sounded like that, what he was really saying is, was that kind of thing consistent with a variety of other provisions that were cited to him? Your Honor, my response to that is the government's wrong about that, and I would urge the court to look closely at the opinion. If you look at the opinion, the first part of the opinion is an analysis of five or six statutes that have nothing to do with any of it, Buy American Act, that sort of thing. And General Biddle marches through those, and in all of them he concludes that the test is, is this something that is reasonably necessary to prosecute the war? If it is, First War Powers Act in 9001 authorizes. Then in the second part of his opinion, and this was driven by the request he received from the Secretary of War, he was given three specific scenarios, three specific contracts. And the question to him was, can we enter these? Are these authorized? And the third one, the one involving the dredge, indisputably was an open-ended indemnification. It was indemnity of a dredge, which you could argue is close-ended, but also indemnity of costs under the Longshoremen's Act, which the case law was clear at the time. Those are open-ended. There's no limit to them. And in concluding that they were authorized, that clearly had not, if you look at the statutes that were listed in the first part of the opinion, none of those would bar an indemnity. So there's no connection between the analysis of those statutes and what we have here. And if you stop and think about it further, what was the only test that General Biddle put to the indemnification promise? It was, is it reasonable to say this is necessary to win the war? That wouldn't be a question unless you were thinking about the Anti-Deficiency Act, because there is no other law, at least none that I'm aware of, that would bar an indemnification promise. So the analysis must have been, is this authorized? Well, the only test is from the first War Powers Act in 9001, is it necessary to prosecute the war? Once you pass that, yes, it's authorized. Okay. We're going to have to sit down. But we cut you off at the beginning. You said there were three fundamental errors. I'm not going to let you go into detail as to what it was, but what was the third? The third is really simple. The court interpreted a stipulation that said that the parties settled issues as a release. The settlement is not necessarily a release. Okay. So we're going to give you your five minutes for rebuttal. If the government needs it, they get an extra ten minutes. Thank you, Your Honor. Or if you want it. You might say, I don't want to stand up here that long. May it please the Court. I'd like to lead off with... Oh, Mr. Cassini, let's lead off with where we left. Is the government's position that a termination agreement is the same as a general release? In this case, we believe that the plaintiff cited the law correctly, so a settlement agreement might be a general release, but we don't have the contents of the settlement agreement here. It's a slightly more nuanced argument. What we have is that we know that all other issues concerning the contracts were settled between the parties in the 1940s. And if you look at DuPont, this Court's decision in DuPont, it discusses Contract Settlements Act settlement agreements, and at least the agreement in that case and the purpose of the Contract Settlement Act was for final settlement of all claims, basically to clear the decks. So if I settle a case with the government on behalf of a client, and as part of it I negotiate an indemnity against future claims, the case is settled, isn't it? That's exactly true, but what we have here is we have a stipulation that the parties did enter into some sort of settlement agreement, so now the burden belongs to the oil companies to show that the contents of that agreement, that somehow there's clear and unambiguous indemnity. I'm having a hard time following that burden shifting here. So the only stipulation is, yes, there was a settlement agreement. There's no stipulation that there was a general release at all. There's no stipulation as to what the terms of that settlement agreement was. There's no stipulation that the terms of the settlement agreement didn't expressly retain the right with respect to future charges, taxes, et cetera. So how does it become their burden if they merely stipulated to the fact of a settlement to somehow disprove all of those negatives? Because at that point there would be some sort of instrument that demonstrates the agreement, and it would be their burden to seek relief under that particular agreement, and that's what happened in Ford and in DuPont, where the court found the legal force not in the original World War II era contracts, but in the CSA termination agreement. But if there was a complete release, a general release, wouldn't the government be the one that would be having to assert rights under that document? Yes, that's true. All right. And the government couldn't produce the document, and neither could the oil companies. That's right. Okay. And I'd like to address Judge Wallach's first question to Mr. Kirk regarding pre-war acid dumping practices. And the answer to that question can be found. What do you mean by pre-war, Mr. Tusini? Let's start with that. Well, pre-war, I'd talk, say, 1940, 1941. That's where the stipulations go to. And just remember also that these refineries were in California, and Mr. Kirk admitted that the words he used were, the production was minute. I'm assuming that he meant avgas there. So we're talking about at least before the war and before the refineries ramped up to produce avgas, they were dumping acid waste in the production of other products. But it is true that before Pearl Harbor, the government was essentially conscripting these oil companies to make avgas to ship overseas, isn't it? There's nothing in the record that reflects that, and we disagree with any argument regarding contractualization. There was really nothing in the record to reflect that they weren't, and yet you argue in your brief that they clearly weren't. And so that's the problem. I mean, if we're all just talking about history generally, then there's plenty in the historical record to say that they were. In 1938, the Brits start planning for the war, and they have a limited number of fighter squadrons that they think they can field against the Germans because they're not going to have enough avgas. But, they say, in 1939, to our pleasant surprise, the United States agreed to fill all our requirements by ramping up production. So something happens in 1939. There's nothing on the record regarding any government action compelling the oil companies to do anything. And remember, that's more along the lines of an equitable consideration that the Ninth Circuit already addressed and rejected when it found that the government was not the arranger of the wasted issue in this case, except for 5.5% of the waste that the government admitted it was the arranger for. So, what we have here is a case of strict contract interpretation. Was there a meeting of the minds between the oil companies and the government that the isolated use of the word charge in the avgas… What we also have here is not just an equitable question, but a question of interpretation of a contract in the light of the situation as it existed at the time. Do you agree with that? I'd agree with that. And going back to the time, if you look at the stipulations 409 through 411, there at page A565, it's very telling that Shell, who dumped the most acid waste of any of the plaintiffs in this case… You meant to say produced the most avgas? Well, their liability was allocated in accordance with the amount of… I believe it's the amount of waste. If you look at 1940, they dumped 34,000 barrels of waste. 1941, 92,000 barrels of waste. It wasn't until 1942 that the contracts that purport to create indemnity were entered into. There was 100,000 barrels that year. 1943, 112,000 barrels. 1944, it dropped to 66,000. So there's no clear cause and effect between the avgas contract here and business decisions to dump waste. What about the content of the waste at the MacMillan site? What percentage of that waste that was dumped there is attributed to the production of avgas? Well, there's uncontradicted expert testimony in the trial court, which we didn't put in the appendix, but if the court were to have to allocate, that it would be a maximum of 28% of the waste. And that's because all of the non-avgas products, which the oil companies produced throughout the war, they produced before the war, during the war, and after the war, all of those products required acid treatment. And in this case, we're only concerned with the cleanup of the MacMillan site. That's true. This is a very discrete waste stream of acid waste from the alkylation units that Mr. McColl would pick up in tanker trucks and then dump at the site in Fullerton, California. As avgas, we're saying 100 octane? That's right. Oil companies also produced 91 octane avgas, kerosene. When we barred the Japanese with embargo, that was 85 and then 80 octane gas as aviation gas. That's right, but the oil companies in the mid-1930s were also producing 91 and 100 octane avgas as early as 1935. So this wasn't a brand new product. It was a very useful product, obviously. Counselor, let me go back to something that you said, and I just need some clarification. It seems to me that you said that contract interpretation is undertaken with respect or in consideration of the historical circumstances that surrounded it. Is that what you're saying? No, we're not saying that. We're saying you look at the plain language of the contract. Okay. So the plain language of the contract here— So let me go back to that because you argue in your brief, at least initially, that this is just a pure tax. If it's not a tax, if it's not from a municipal or a federal or a state, and it's in the form of a tax, that therefore it's not covered by the clause. But if you're looking at just normal contract interpretation principles, you use the words tax or charges in the disjunctive. They have to mean something different, don't they? Well, what they mean is that you're talking about tax-like levies for generation of revenue, and sometimes governments call those things fees. Sometimes governments call those things charges. It doesn't say tax or charges for generation of revenue in this clause at all. No, it does not. But if you look at the clause as a whole and you look at, for example, the reference back to taxes, fees, or charges as such taxes, you look at Section C, which refers to tax authorities determining whether ABGAS sales are exempt from taxation. You look at Section B, which shows the intent that taxes, charges, or fees were the kinds of things that the government believed it was exempt from based on its government status. All of those things point to concluding that it's a narrower definition of the term charge. And the trial court did look at a lot of dictionary definitions, and there were tax-related definitions of charge that the trial court discussed in detail. Right, but there were also plenty of non-tax-related definitions of charges that can be found in dictionaries as well. I mean, it seems like the trucker was picking and choosing there. The trial court selected a definition that comportable. First of all, the clause was called the Taxes Clause. So it was not called an Indemnity Clause. It was not called a Hold Harmless Clause. It was not called any of those things. Well, they're not asking to recover for costs or charges that come from anywhere other than the obligations imposed by governmental entities. So they're not saying it's completely open-ended. They're saying it still relates solely to a charge or an obligation that's imposed by the government. And here it's imposed by California through the authority of the federal government under surplus. And it was imposed by the courts. And under that argument, any time a court imposed liability related to abdication. No, the court enforces the law. The court didn't impose the liability. The law imposes the liability. The court merely says, yes, I'm enforcing that. I mean, if we had the authority to impose obligations, I think that we'd have to reconsider what the structures of the branches of government are. I mean, we don't have that authority. Well, if you look at the DuPont case, and if we want to talk about specifically Superfund in general, DuPont made very clear that CERCLA or Superfund had its genesis in the law of nuisance. And that basically it was the same common core of operative facts that would spell out either a nuisance claim or a claim under CERCLA. You're talking about common tort law. Common tort law. And so at the time it was entirely foreseeable that property damage caused by discharge of pollutants into the environment could result in some sort of liability. And if you want to use the most broad possible colloquial definition, it would be money charged for abatement of that nuisance. And if you look at the taxes clause as a whole, it's clearly outside of the scope. But, you know, that's a nice argument, but the statute of limitations never would have allowed Shell to have that obligation. So the CERCLA creates basically an unending statute of limitations because it is an independent federal obligation that doesn't arise from normal tort law. Well, we would respectfully disagree with that because there really shouldn't be a difference as to whether the nuisance was caused in 1946 from acid waste migrating from McColl's land onto a neighbor's land and possibly killing livestock, or whether that nuisance was ultimately discovered in the 1990s when developers wanted to develop a golf course on that parcel and acid waste started bubbling up through the ground. Both the issue of the statute of limitations is really, we don't think, an important distinction here. And also very telling, which we did attach to the appendix, are the two contracts, the DuPont contract and the Humble Oil contract, which contained both explicit indemnity clauses that covered property damage of the sort that the court found in Ford to be reimbursable under that contract and contained taxes clauses. So why would the parties draft a taxes clause if they believed that remediation of property damage or remediation of a nuisance was a covered cost under the contract? Well, there is such a thing as felt suspenders, is there not? I mean, you know, maybe they had a more careful set of drafting laws. That doesn't mean that the taxes and charges clause doesn't cover exactly what they want it to cover in this particular case. No, because if you look at it, in fact, those clauses contradict each other to some extent where, for example, one of the two contracts, the Humble Oil contract, the indemnity clause precludes property damage to the contractor's own property, whereas under the plaintiff's interpretation of the taxes clause, that sort of property damage could be remediated as a charge. So there was a very strong contrast between the two. Well, the charge would have to come from the government. Again, they're not just saying any charge, any cost, any anything. They're saying that the obligation has to be imposed by a governmental entity as defined in the clause. Well, first of all, under CERCLA, that's not necessarily how the law works. A landowner can sue under CERCLA and sue the potentially responsible parties and seek contribution to a cleanup. A party can clean up their own mess. So in that case, there is no liability imposed by the government. Even if that was a fair distinction, that's not what we have here. Well, then we'd have happenstance as to whether who sued who for the same violation. But you're avoiding that whoever brings that action, that scheme and that liability is imposed by the government after the fact by the legislature in CERCLA. Yes, it is. But we don't believe that distinction merits calling this sort of calling CERCLA liability a charge. And in fact, there's nothing else in the contracts that would indicate the parties ever intended such broad sweeping indemnity that the oil companies need to prove to prevail in this case. What about the analogies to all the radiation cases and the production of nuclear weapons cases? Well, I'm not an expert in that, but I believe that the McCarran-Ferguson Act contains an explicit waiver of the Antideficiency Act to allow indemnity. It comes right out of the Treasury in the GOKO cases. I'm not sure of those cases. But that's certainly not the case here where President Roosevelt explicitly imposed antideficiency restrictions on the oil companies. Every court to have looked at this issue, whether it's the Johns Manville Court or the trial court in DuPont or the trial court here, looked at that plain language of Executive Order 9001. The trial court the second time here. Yes, the trial court, Judge Wheeler in this case, held that the Antideficiency Act was imposed by the President. He did not allow individual contracting agencies or the contracting agency here. He withheld actual authority from the contracting agency here to enter into contracts that would result in a deficiency. How do you respond to your friend's argument that, in fact, he didn't reimpose the entirety of the Antideficiency Act? He could have, but he didn't. If you look at the plain language of the statute, it says, No executive department or other government establishment of the United States, page 48 of our brief, shall expend in any one fiscal year any sum in excess of appropriations or involve the government in any contract or other obligation for the future payment of money in excess of such appropriations. And the President here said, only within the limits of the amounts appropriated, therefore, to enter into contracts. He didn't say anything about this fiscal year or next fiscal year. Well, that's part of the problem. As counsel on the other side points out, the War Powers Act essentially wipes out the Antideficiency Act. This is an argument where you're saying he's reimposing it. And when you say, Well, he didn't say anything about this fiscal year or next fiscal year. You're actually trying to say that somehow he meant to incorporate this entire statute that he'd already been given the authority not to use, not to resort to. So isn't the fact that the language is less detailed than the Antideficiency Act more meaningful for your opponent's argument than it is for yours? No, not at all. First of all, I don't believe Shell made this argument below. Second, the important thing to keep in mind here is that the President's language is sweeping and broad and it encompasses both current year appropriations and next year's appropriations. He didn't limit it to one of those two prongs of the Antideficiency Act. He clearly covered both. He talked about appropriations, not this year's appropriations or some other year. How could we be entering into three-year contracts here? These didn't cover one-year terms, did they? They covered three-year contracts, but plaintiffs haven't come... That's correct, but the government also had the ability to terminate the contract. So, you know, in that case, there was certainly, if there was a lack of an appropriation, the government could have terminated. And that occurs all the time. Governments terminate for convenience. Governments automatically enter into three-year contracts and then say, we're going to have to terminate them each year, even though I entered into a three-year contract because of the Antideficiency Act? That's not how it works. Well, the government has the authority to terminate. They always have the authority to terminate contracts, but then they can get sued for that termination depending on what the circumstances are. You're not telling me that they entered into a three-year contract in order to induce these oil companies to basically create this Avgas at a minimum profit and always had the intention that at the end of each year, they were going to terminate and re-up? No, not at all. But certainly, if appropriations are not there when the next year comes around, the government is free to terminate. And especially in wartime, who knows when the war is going to end? So you're saying, under your theory, they could have entered into a 20-year contract as long as they could terminate whenever they want, and you think that wouldn't violate the Antideficiency Act? That hypothetical possibly gets under the line in the language of 9001, so long as there's some sort of appropriations. But the government, remember in these contracts, when you're buying the Avgas and paying for it every month, you're not spending any money until it's appropriated. So the next fiscal year comes around, and the government's not going to spend any more on that contract until it has an appropriation. And in the appendix, we have some of President Roosevelt's budgets, and in fact, immediately after Pearl Harbor, he submitted the FY43 budget to Congress, and he said, we need war appropriations so that we have funds to enter into contracts. He was very explicit about that. For these reasons, we respectfully request the court to adjourn. Do all the government contracts during the war contain similar clauses? Tanks, ships? I'm unaware of whether all contracts do. I do know that the DuPont contract did, and some other Avgas contracts did as well. The DuPont contract was for anhydrous ammonia. This is, as far as I know, the first time that the taxes clause has been litigated, and certainly the first time that it's been treated as a sweeping indemnity clause. Now, I think I can safely say this, because I assume you didn't negotiate these contracts back in 1948. Your Honor, I will acknowledge that. But is that... Are we just looking at a situation where maybe DuPont's lawyers or Ford's lawyers were just a little more careful, and that you needed a clause in here that you just didn't put in here? No, we're not, Your Honor. The clause... I don't need the clause that they had, which I acknowledge was different. And each of theirs was different from each other's, by the way. The clause that I have, the clause that my drafters, or the government, actually, has drafters put in, says that any taxes, fees, or charges, new or additional, added by a law, and Your Honor pointed out CERCLA here is obviously a law, and arising by reason of the production of ag gas, is covered. And by the way, in that, Your Honor, I think Judge Reyna asked how much of this waste arises from the production of ag gas, and my friend said 28%. That's not correct. The federal district court found it was 100%. And there is a stipulation in this record, and our position is they're bound by that. But even if they're not bound by that, as a matter of issue preclusion, they have stipulated that every bit of waste at the McCall site arose initially from 98% sulfuric acid that was used in the production of ag gas. Your Honor, one point you made that I want to make sure I emphasize, you'd ask the question, how long were these contracts, and my friend acknowledged that they were 3 years long, and you asked whether that isn't contrary to the Anti-Deficiency Act. I would direct the court's attention to Leiter v. The United States, LEITER 271 U.S. 204, and this is discussed in the amicus brief submitted by the American Fuels and Petrochemical Society. That is a 1920 Supreme Court decision that squarely held that such contracts are contrary to the Anti-Deficiency Act. So there can be no doubt, everyone at the time thought that the Anti-Deficiency Act didn't limit these contracts. That's how you get General Biddle's opinion on 9001 and the first War Powers Act, and finally on the Anti-Deficiency Act issue, I would urge the court to the extent it has any doubt at all on this, there's a second completely independent delegation through 9024, and if you compare that delegation, which is discussed in some detail in our briefs, where the president gave the War Production Board complete control of all production, procurement, and contracting, if you compare that to the delegation that the Ninth Circuit had before it in the Cadillac Fairview case, ours is specific to contracting. My friend in his brief said that there's no mention of contracting, but my friend was just mistaken. In paragraph 2B of that executive order, the president gave all power related to making policy regarding procurement and contracting, and if there's any doubt left on that, my friend points to paragraph 6 of that order, which did not relate to contracting, but rather gave the chairman of the board the power to rent office space and hire secretaries and buy office supplies, and for that provision, paragraph 6, he said, don't spend any money in excessive appropriations, but that's not in the paragraph about contracting, and the reason is obvious. At the time, the president and Congress had all agreed. The last thing we want to do is hobble prosecution of the war by virtue of all these normal contracting restrictions. Judge Wallach, I want to go back to your original question to just make one last point to make sure it's clear. If you look at page 11 of the red brief, and I think they cite the appendix, it is undisputed that all of the waste that's at issue in this case did not get deposited at the McCall site until beginning in 1942, and that's to take nothing away from your point that both the oil companies and the government were ramping up because of the situation with the British prior to that, and really the main point that comes out of that entire discussion that you emphasized is that the government drafted this contract. When we take a look at the memorandum, at the formal opinion by Attorney General Francis Biddle, didn't he enumerate a list of statutes that he's referring to as applying to his memorandum? And the ADA was not included in that list, correct? Your Honor, the list... The ADA wasn't included in the list. He didn't generate the list. The list was generated by the Secretary of War in his request to General Biddle, and as I think I told Judge O'Malley... His opinion was limited to the statutes that he included on his list. No, his opinion was not, Judge Rana, and let me explain why. The first part of his opinion was, the first part of his opinion, he was responding to the Secretary of War's question, are we bound by this list of statutes, none of which was the ADA, and I'm not relying on that part. The second part of his opinion, though, the Secretary of War asked him, here are three contracts we want to enter. One of them was an open-ended indemnification. Can we enter it? And General Biddle said, so long as it's necessary to prosecute the war, yes, you can. Now, I acknowledge that he didn't say anything about the ADA, but it could... First of all, the question he was answering wasn't necessarily what is the meaning of the ADA, it was, are... is the governmental officers authorized to enter this contract? And the only thing that would have prohibited entry into an indemnification, if it applied, would have been the ADA, but what General Biddle said was, I've got the First War Powers Act, I've got 9001, that say, any contract restrictions related to prosecution of the war don't apply. So in answering that question about the open-ended indemnification, Judge Reyna, General Biddle said, there's only one test here. Is it reasonable to say, in good faith, that this is necessary to win the war, or to prosecute the war? And when the answer is yes, he said, obviously, this is justified. And I thank you for your indulgence, Judge O'Malley, for the foregoing reasons to ask the Court to reverse the judgment. Okay, the case is submitted. All rise. Thank you.